UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

AUDREY SWANN
Plaintiff

v.                                              C.A. Numbers: 09-1586 (RLW)
                                                                11-0419 (RLW)

OFFICE OF THE ARCHITECT
OF THE CAPITOL
        Defendant

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Defendant respectfully submits this motion for summary judgment pursuant to Federal

Rule of Civil Procedure 56.

Plaintiff Audrey Swann was employed in the Electric Shop, House Office Building of the

Architect of the Capitol (AOC).  She came on duty as an Electrical Worker on April 30, 2007,

and was the only female employed in the Electric Shop.  At issue in this matter are Plaintiff's two

complaints that have been consolidated for purposes of discovery.

The first complaint, 09-1586, alleges:

• 	disparate treatment and disparate impact gender discrimination based on failure to
	provide adequate female locker room facilities (Counts 1 & 2)

• 	disparate treatment gender discrimination due to social and professional isolation
	(Count 3)

• 	disparate treatment discrimination due to segregation of Plaintiff by job assignment from
	male employees (Count 4)

• 	retaliation due to the manner in which her Complaint to the Office of Compliance was
	processed. (Count 6)

• 	hostile work environment based on gender and retaliation (Count 5 & 7).

6

The second complaint, 11-419, alleges:

- gender discrimination and retaliation due to issuance of an incident report on November 17, 2009 (Count1 & 10)

- gender discrimination and retaliation re November 24, 2009 proposal to reprimand (Count 2 & 11)

- gender discrimination and retaliation re December 16, 2009 concurrence to proposal to reprimand (Count 3 & 12)

- gender discrimination and retaliation re February 5, 2010 final agency decision to officially reprimand (Count 4 & 13)

- gender discrimination and retaliation due to mishandling of her November 10, 2009 grievance (Count 5-7 & 14-16)

- gender discrimination and retaliation due to January 20, 2010 denial of Plaintiff's grievance (Count 8 & 17)

- hostile work environment based on gender and retaliation (Count 9 & 18).

The Court lacks jurisdiction over some of Plaintiff's claims due to failure to exhaust as required by the Congressional Accountability Act.  Plaintiff has failed to establish a prima facie case of discrimination or hostile work environment.  Additionally, Defendant has legitimate, non-discriminatory reasons for its actions, and Plaintiff cannot establish that discrimination was either the reason, or a reason, for Defendant's actions.

Defendant requests that the Court grant Defendant's motion for summary judgment as to all of Plaintiff's claims.

This motion is accompanied by a memorandum of points and authorities, statement of

material facts, and proposed order.

Respectfully submitted,

RONALD C. MACHEN Jr., D.C. Bar #447889
United States Attorney

DANIEL F. VAN HORN
D.C. Bar # 924092
Civil Chief

By:      /s/ Rhonda C. Fields
RHONDA C. FIELDS
Assistant United States Attorney
Civil Division
555 Fourth Street, N.W.
Washington, D.C.  20530
202/514/6970
Fax:   202/514/8780

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

AUDREY SWANN
Plaintiff

v.                                              C.A. Numbers: 09-1586 (RLW)
                                                                11-0419 (RLW)

OFFICE OF THE ARCHITECT
OF THE CAPITOL
        Defendant

MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

I.      STATEMENT OF FACTS AND PROCEDURAL BACKGROUND

See attached Statement of Material Facts.

II.     ARGUMENT

A.      SUMMARY JUDGMENT STANDARD

Summary judgment may be granted when the pleadings and evidence demonstrate that

there is no genuine issue as to any material fact and that the moving party is entitled to judgment

as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Diamond v. Atwood*, 43

F.3d 1538, 1540 (D.C.Cir. 1995). A genuine issue is one that could change the outcome of the

litigation. *See Anderson v. Liberty Lobby, Inc*, 477 U.S. 242, 243 (1986). While all evidence

and the inferences drawn there from must be considered in the light most favorable to the

nonmoving party, *see Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 587

(1986), a complaint should be dismissed if it "appears beyond a reasonable doubt that plaintiff

can prove no set of facts in support of his claim which would entitle him to relief." *See Conley v.*

*Gibson*, 355 U.S. 41, 45-46 (1957). "[A] complete failure of proof concerning an essential

element of the non-moving party's case necessarily renders all other facts immaterial[,] [and]

[t]he moving party is 'entitled to judgment as a matter of law.'"  *Celotex Corp.,* 477 U.S. at 323 (citations omitted).

### B.  CAA DISCRIMINATION CLAIMS

As an employee of the AOC, Plaintiff's complaints of sex discrimination and retaliation can only be brought pursuant to the Congressional Accountability Act (CAA).  *See Hollabaugh v. Office of the Architect of the Capitol*,  847 F.Supp.2d 57, 60 -61 (D.D.C. 2012); 2 U.S. C. §§ 1301, 1311& 1317.

Discrimination and retaliation claims  brought under the CAA are analyzed under Title VII's framework and standards.  *Herbert v. Architect of Capitol,*  839 F.Supp.2d 284, 291 fn 2 (D.D.C. 2012) (and cases cited therein).

Plaintiff has not submitted any direct evidence of discrimination based on sex, gender or retaliation.  Therefore, the Court may evaluate the case under the so-called *McDonnell- Douglas* framework as modified by the District of Columbia Circuit.  Under the procedure first set forth in *McDonnell-Douglas Corp. v. Green*, 411 U.S. 792 (1973), the plaintiff must first establish a prima facie case of prohibited discrimination.  *See St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 506 (1993).

Under *McDonnell-Douglas*, if the employee succeeds in establishing a prima facie case, the employer then must articulate legitimate, nondiscriminatory reasons for its actions.  See *McDonnell-Douglas*, 411 U.S. at 802.  The defendant bears only the burden of articulating the nondiscriminatory reasons for its actions.  *Texas Dept. of Community Affairs v. Burdine*,  450 U.S. 248, 259-260 (1981).  The plaintiff then has an opportunity to discredit the employer's explanation or otherwise demonstrate that discrimination was either the or a motivating factor for

the employment action. *Aka v. Washington Hospital Center*, 156 F.3d 1284, 1288-89 (D.C. Cir. 1998). The plaintiff at all times retains the burden of persuasion. *McDonnell-Douglas*, 411 U.S. at 802; *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 143 (2002).

As a general matter, to establish a prima facie case of discrimination, a plaintiff must demonstrate by a preponderance of the evidence that (1) she was a member of a protected group, (2) an adverse employment action took place, and (3) the unfavorable action gives rise to an inference of discrimination. *Stella v. Mineta,* 284 F.3d 135, 145 (D.C. Cir. 2002)(Title VII); *Aka,* 156 F.3d at 1288.

In cases where the defendant has legitimate non-discriminatory reasons for an adverse action, District Courts "must conduct one central inquiry in considering an employer's motion for summary judgment or judgment as a matter of law, 'whether the plaintiff produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the plaintiff on a prohibited basis.'" *Adeyemi v. District of Columbia*, 525 F.3d 1222, 1226 (D.C. Cir. 2008), *citing Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 493-494 (D.C. Cir.2008).

A plaintiff must present substantial and credible evidence of discrimination in order to survive a motion for summary judgment. *See Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999) ("Accepting [some] conclusory allegations as true, therefore, would defeat the central purpose of the summary judgment device, which is to weed out those cases insufficiently meritorious to warrant the expense of a jury trial."); *Hastie v. Henderson*, 121 F.Supp.2d 72, 77 (D.D.C. 2000), aff'd, No. 00-5423, 2001 WL 793715 (D.C. Cir. 2001)("To defeat a motion for summary judgment, a plaintiff cannot create a factual issue of pretext with mere allegations or

3

personal speculation, but rather must point to 'genuine issues of material fact in the record.'");

*Woodruff v. DiMario*, 164 F.Supp. 2d 1, 5 (D.D.C. 2001).  Additionally, there will be "instances

where, although the plaintiff has established a prima facie case and set forth sufficient evidence

to reject the defendant's explanation, no rational factfinder could conclude that the action was

discriminatory." *Weigert v. Georgetown University*, 120 F.Supp. 2d 1, 22 (D.D.C. 2000),

*quoting, Reeves v. Sanderson Plumbing Co.*, 530 U.S. 133 (2000).

> The *McDonnell Douglas* analysis applies to retaliation claims as well.  *Hampton v.*

*Vilsack*, 760 F.Supp.2d 38, 50 (D.D.C. 2011).   To establish a prima facie case of retaliation, a

plaintiff must show that she engaged in statutorily protected activity, a reasonable employee

would have found the challenged action so materially adverse that she would have been

dissuaded from making or supporting a charge of discrimination; and a causal connection existed

between the two.  *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006).  Whether

an action is materially adverse "will often depend upon the particular circumstances" of a given

case.  *Jones v. Bernanke*, 538 F. Supp. 2d 53, 59 (D.D.C. 2008).

## C.  Exhaustion of Administrative Remedies

> Under the CAA's 3-step administrative process, a complainant must file a request for

counseling with the Office of Compliance within 180 days of the alleged act of discrimination.

*Blackmon-Malloy v. United States Capitol Police Board*, 575 F.3d 699, 702 (D.C. Cir. 2009).

Unlike the administrative requirements in Title VII, the three step administrative process under

the CAA is jurisdictional.  *Id.*   The Procedural Rules of the Office of Compliance (PROC)

require that the request for counseling be in writing.  (App 190, PROC §2.03).

The plaintiff bears the burden of establishing that the court has subject matter jurisdiction. *Delfani v. U.S. Capitol Guide Bd.*, 2005 WL 736644, 2 (D.D.C. 2005) (*citing Forrester v. United States Parole Comm'n*, 310 F.Supp.2d 162, 167 (D.D.C.2004), and *McNutt v. Gen. Motors Acceptance Corp.,* 298 U.S. 178, 189 (1936)). "It is a firmly established rule that subject matter jurisdiction is tested as of the time of the filing of the complaint." *Delfani*, 2005 WL 736644, 2.

Plaintiff alleges that Complaint 1, CA 09-1586,  is brought pursuant to Plaintiff's  request for counseling in Office of Compliance Case # 08-AC-57 (CV,RP) in which Plaintiff filed her Request for Counseling on August 6, 2008.  (CA 09-1586 ECF 9 , Complaint 1 ¶¶1-2, 4).  One hundred eighty days prior to August 6, 2008 is Feb. 8, 2008.  Therefore, any alleged discrete acts of discrimination prior to February 8, 2008 or after August 6, 2008, are not within the Court's jurisdiction and should be dismissed.

Plaintiff alleges that Complaint 2, CA 11-0419, is brought pursuant to Plaintiff's request for counseling in Office of Compliance Case # 10-AC-77 (CV,RP) in which Plaintiff filed her request for counseling on May 14, 2010.  (CA 11-0419 ECF 1, Complaint 2 ¶¶ 1-5).  One hundred eighty days prior to May 14, 2010 is November 14, 2009.   Therefore, any alleged discrete acts of discrimination prior to November 14, 2009 or after May 14, 2010, are not within the Court's jurisdiction and should be dismissed.

## D.  EXAMINATION OF PLAINTIFF'S CLAIMS

### COMPLAINT 1:  09-1586

**1.** **Counts 1 & 2 – Disparate Treatment and Disparate Impact Gender Discrimination Based on Alleged Failure to Provide Adequate Female Locker Room Facilities**

Within the Electric Shop at the HOB in the Rayburn Building where Plaintiff was

5

employed is a locker room where the Electric Shop workers can change and/or store their

belongings in a locker.  The locker room does not have toilet or shower facilities.  In addition to

lockers, it has only a sink.  (App 231, Swann Depo 137:5 - 22).

Prior to being employed by the HOB Electric Shop in the Rayburn Building, Plaintiff had

been a temporary employee in the Electric shop in the Capitol Building. (App 230-231, Swann

Depo 133:9-17; 139:1–3; *see also* App 1, SI-PROGS at 1).  After she was selected for the

position in the HOB Electric shop, the Capitol Building allowed Plaintiff to stay there on a

temporary assignment for approximately 30 days while the HOB decided what provision to make

concerning Plaintiff's locker room use.  (App 231, Swann Depo 139:3- 140:12).

Plaintiff's Answer to Defendant's Interrogatories  (SI-Prog)  states that on April 30, 2007,

she commenced working in the HOB Electric Shop, and that

> Defendant on April 30, 2007, had not provided a secure locker room suitable for
> the female Plaintiff and denied Plaintiff equal access in the workplace.  Defendant
> had simply installed a sliding lock on the door to the locker room to keep males
> out of the locker room when Plaintiff was using the locker room and keep the
> Plaintiff out of the locker room when the approximate 17 males on her shift were
> using the locker room.

(App 2, SI-Progs p. 2).    Plaintiff complained to the HOB Electric shop supervisor that she did

not like the lock system, but wanted a separate locker room:

> Plaintiff spoke with George Hammett, former General Foreman of the House
> Electric Shop respecting the position she was placed in by the absence of a
> separate locker room for the female Plaintiff in the Electric Shop. Plaintiff was
> precluded from using the female locker room on the other side of the Rayburn
> Building from the Electric Shop as the lockers were not assigned for permanent
> use.
> Plaintiff recognized and accurately predicted the problems either she or the
> approximate 17 males on her shift would have in timely reporting for duty or
> leaving at the end of their shift depending upon who got to first occupy the sole
> locker room in the Electric Shop: the one female or the seventeen males on the

same shift with the female Plaintiff.
Former General Foreman Hammet advised the Plaintiff that he had no control
over what management decided to do about the locker room and advised the
Plaintiff to speak with Assistant Superintendent Murphy of the HOB's.

(App 2-3, SI-Progs p. 2-3).

Plaintiff "contacted  Assistant Superintendent Murphy and by phone message requested a

meeting to speak with him regarding the absence of a female locker room for her use." (App 3

,SI-Progs p. 3).  During the first week of May, 2007, Plaintiff met with Assistant Superintendent

Murphy.  According to Plaintiff, he advised her that "we don't have any other space for a

separate locker room for females . . . we did the best we could do with what we had with the

locker room in your shop and that the Plaintiff could use the bathroom across the hall from the

Electric Shop."  (App 3,SI-Progs p. 3).   Plaintiff states that she advised Murphy "that this

arrangement was not the same as a separate female locker room and was not acceptable."  *Id.*

(*See also* App 350-351, Murphy Dec ¶ 12). (Murphy told her that the decision to use the lock was

final).

Plaintiff's interrogatory response states that after speaking with Assistant Superintendent

Murphy, she had the following conversation with her electric shop supervisor:

Plaintiff then spoke with former General Foreman Hammett and "asked what all
did they do about the locker room in our shop to get it ready for me."
General Foreman Hammett kind of chuckled and said "sorry Audrey its not funny
but they took all that time and they only put a door on it for you with that little
slide lock because it   was wide open at first."
To which Plaintiff responded: "that was not going to fly. "
General Foreman Hammett responded that he understood the Plaintiffs position
and that it was out of his hands.

(App 6, SI-Progs at 6).

Thus, it was clear at the time Plaintiff was allowed to begin working at the HOB on April

30, 2007, that the provision that had been made for her was putting a lock on the locker room

door so that she could exclude her male co-workers when she was changing.  The finality of the

decision was conveyed to Swann in May 2007 by Deputy Superintendent Murphy.  By Plaintiff's

own admission,  Mr. Hammett thereafter confirmed that the provision that had been made was

putting on a door with a lock.

### Failure to exhaust disparate treatment claim

Although the decision that there would be no separate female locker room and that

Plaintiff would use the Electric Shop locker room with the lock system was clearly conveyed to

Plaintiff no later than her May 2007 meeting with Assistant Superintendent Murphy,  Plaintiff

failed to seek counseling until August 6, 2008  – over a year later.  Because Plaintiff did not seek

counseling within 180 days of her notification of the decision on the locker room, the Court lacks

subject matter jurisdiction over her disparate treatment claim.  *Gordon v. Office of the Architect*

*of the Capitol*,  750 F.Supp.2d 82, 90 (D.D.C. 2010)("an adverse employment action occurs and

the filing period limitation of the statute begins to run on the date a person is notified of an

employment decision").

### Failure to Exhaust disparate impact claims

To the extent Plaintiff alleges disparate impact, the Court similarly lacks jurisdiction over

any alleged disparate impact claim which occurred prior to Feb. 6, 2008 or after August 6, 2008.

In explaining the Supreme Court's decision concerning Title VII disparate impact exhaustion, the

*Conley* decision stated:

> The[Supreme] Court agreed with the Seventh Circuit that the City's "decision to
> adopt the cutoff score (and to create a list of the applicants above it) gave rise to a
> freestanding disparate-impact claim" that, because no timely charge was filed

attacking it, was time barred. *Id*. at 2199. However, the Court clarified that each
time the City implemented its earlier decision and excluded the applicants with
lower scores on the exam, a "new violation occurred." *Id*. (citing 42 U.S.C. §
2000e-2(k)). *Lewis*, therefore, stands for the proposition that later implementation
of a policy that causes a[] disparate impact can qualify as a new, actionable
"employment practice." *See Id*. at 2198-99.

*Conley v. Nestle USA, Inc*., 2011 WL 332525, 4 (N.D.Ill. 2011). To be timely the new violation

must have occurred within the 180-day CAA limitations period. *Chicago Police Sergeants Ass'n*

*v. City of Chicago*, 2011 WL 2637203, 4 (N.D.Ill. 2011) ("Of course, in order to be timely, a

plaintiff must identify a 'present violation' within the [applicable] limitations period preceding

the filing of the charge (or in this case, the complaint). *See* 130 S.Ct. at 2199 (citing *United Air*

*Lines, Inc. v. Evans*, 431 U.S. 553, 558 (1977)).")

Plaintiff has not proffered evidence of any later implementation of the May 2007 locker

use decision, such as the new hire decisions in *Lewis*. Therefore, she has not established that any

new violation occurred within the 180-day CAA limitation period.

But, as is discussed below, even if Plaintiff had shown later implementation, she has

failed to show any materially adverse employment action or any significantly adverse impact.

Therefore, she has failed to establish a prima case of disparate treatment or impact.

**2.     No Reasonable Fact Finder Could Conclude That the Decision That Swann
        Would Share the Locker Room with Her Co-workers Using the Lock System
        Was a "Materially Adverse" Employment Action or Although Facially
        Neutral, Had a "Significantly Adverse Impact."**

Plaintiff has failed to proffer evidence showing a materially adverse employment action

under the disparate treatment theory or showing that the facially neutral locker room policy had a

significantly adverse impact on female employees. As the D.C. Circuit has explained:

Disparate treatment occurs when "[t]he employer simply treats some people less

9

> favorably than others because of their race, color, religion, sex, or national origin." *International Bhd. of Teamsters v. United States*, 431 U.S. 324, 335 n. 15, . . . (1977). "Proof of discriminatory motive is critical" for such claims. *Id.* Disparate impact claims, on the other hand, "involve employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity." *Id.* at 336 n. 15 . . . . "Proof of discriminatory motive ... is not required under a disparate-impact theory." *Id.*

*Anderson v. Zubieta*,  180 F.3d 329, 338 (D.C. Cir. 1999).

Although Plaintiff is not required to prove discriminatory motive under a disparate impact theory of liability, she still is required to show that she was subjected to an adverse employment action.  She must show that she was personally harmed.  *See Young v. Covington & Burling LLP*, 740 F.Supp.2d 17, 21 (D.D.C. 2010) ("the 'basic principles' of standing require 'an individual plaintiff arguing a disparate impact theory [to] show that the challenged policy directly disadvantaged [her] in some fashion') (citing *Bacon v. Honda of Am. Mfg.*, 370 F.3d 565, 577 (6th Cir.2004).  *See also Baird v. Gotbaum*,  662 F.3d 1246, 1248-49 (D.C. Cir. 2011).

Plaintiff and her male co-workers were given exactly the same terms and conditions of employment with respect to the locker room – i.e. lock the door to exclude a member of the opposite sex.  Therefore, she has not shown a materially adverse employment action under the disparate treatment theory.

Nor has she proffered evidence of a significantly adverse impact under the disparate impact theory.  Plaintiff alleges the following harms from having to use the shared locker room:

1)  She claims that in the mornings if she had to change into her work clothes, she would have to wait for the men to change; this would make her late for work and she would be charged 15 minutes annual leave (the smallest increment of leave).  She alleged that this happened several

times.  (App 232-233,Swann Depo 144:19-146:5).    But in her response to Defendant's

Interrogatory 1, in which Plaintiff was asked to describe in detail the factual basis of her

discrimination claims, including the exact date of the alleged act(s) of discrimination, Plaintiff

failed to identify any dates on which she alleged that she was charged leave due to having to wait

for male co-workers to change in the morning.  (App 1-5,SI-Progs p. 1-5.)

In a related claim theory, Plaintiff has alleged discrimination due to "different

administrative criteria" being applied to Plaintiff.  Those criteria pertained to time and attendance

and dress code.  (App 15-16, SI-Progs p. 24-27).  At the Electric Shop there was a so-called

"grace period" whereby if an employee arrived within 7 minutes of the required arrival time the

employee was not charged annual leave.  Plaintiff alleged that because she had to be dressed in

her uniform at the start of work, she was penalized because she was not dressed within the grace

period due to not having access to the locker room, and therefore was charged 15 minutes annual

leave.  *Id.*

But, Plaintiff's response to Defendant's interrogatories identified only the following two

dates within the 180-day limitation period on which she allegedly had to sign in during the grace

period under these "different administrative criteria."   They are April 23, 2008  (App16, *Id*. at

25), and May 1, 2008 (App 17, *Id*. at 26).

Contrary to her allegations, Plaintiff has failed to submit any evidence that she actually

was charged annual leave on those dates.  Indeed, the leave records submitted by Plaintiff show

no annual leave being charged on April 23, 2008 or May 1, 2008.  (App 51-56, Plaintiff's

Document Production in response to Defendant's request for documents in Swann I ("SI

Response Doc ") 177-182).

11

The only other date Plaintiff identified as having to sign in during the grace period was "a day in October 2007," which is outside of the 180-day limitation period. (App 15, SI-Progs at 24).  As with the other dates, Plaintiff's leave records fail to show Plaintiff being  charged leave in 15 minute increments (i.e.  ".25") during the grace period in October 2007.  (App 38-48, SI Response Doc 141- 153; *see also* App 242 at ¶ 2-4 & App 245 leave chart).

Therefore, Plaintiff has failed to submit evidence of an adverse employment action (disparate treatment ) or disparate impact from the locker room policy due to loss of annual leave during the 180-day limitation period.  Similarly, she has failed to submit evidence of an adverse employment action concerning her claim theory of application of different administrative criteria during the limitation period.

2) Plaintiff also stated that in the afternoons, she "just got off later" if men were in the locker room.  If she was in the locker room first, they would bang on the door telling her to hurry up. (App 43-44, Swann depo at 146:6-147:5).   Additionally, although Plaintiff was asked if there were any other major negative impacts in using the locker room, Plaintiff did not contend that she got off later more times than did the men waiting for her, or that she had to wait unreasonably long periods of time. (App 44-45, Swann Depo 147:25-148:12)*. Compare with Ammons-Lewis v. Metropolitian Water Reclamation Dist. of Greater Chicago*, 1997 WL 80949, 5 (N.D.Ill. 1997) (only female fireman-oiler at first assigned to a "slop-closet for a restroom with no water pressure, poor lighting and no mirror" and to a locker room with "peeling paint, a severely puckered floor, a rusted locker with no bottom and no key, no window shade and falling plaster." She later shared a locker room where she had to wait two hours before each shift and half an hour afterwards to shower and change.)

12

Additionally, Plaintiff was asked in  Defendant's Interrogatory 1 to describe in detail the factual basis of her discrimination claims, including the exact date of the alleged act of discrimination.  Her answer failed to identify any date on which she allegedly had to leave late due to waiting for male co-workers to change.  (App 1-5, SI-Prog p. 1-5).  Because Plaintiff bears the burden of proving subject matter jurisdiction, she has failed to offer any proof that any significant disparate impact due to staying late occurred within the 180-day limitation period.

3)  Plaintiff testified that she began just coming to work in her uniform. (App 233, Swann Depo at 147:6-24).  Plaintiff testified there were no other major negative impacts related to using the shared locker room.  (*Id.*, Swann Depo147:24-148:2).   Plaintiff's response to Defendant's interrogatories likewise failed to identify any date within the 180-day limitations period on which she allegedly came to work in uniform.  (App 15-18, SI-Prog p. 24-27).  Therefore, she has failed to establish subject matter jurisdiction.

Additionally, Plaintiff has failed to proffer any evidence with which a reasonable juror could find any material adverse consequence or significantly adverse impact in coming to work in her uniform.  Plaintiff's uniform consisted of navy blue pants and jacket, and a light blue shirt. (App 233, Swann Depo 147:10-24).  These ordinary clothes would not have a negative impact on the Plaintiff.

Plaintiff's complaint also claimed that there was "hostility" towards her as a result of the absence of a female locker room.  She described it is follows:

Q. . . .When you say hostility, are you talking about the knocking on the door or
something else by your male coworkers?
A Yeah, that's what I mean.
Q The knocking on the door and saying hurry up and get out?
A Yes, it just the constant day-to-day kind of bickering and badgering about hurry

> up, get out, or we're trying to get in; because people want to get out within that
> seven-minute grace period.  Lord forbid you disrupt them from getting out seven
> minutes early.

(App 234, Swann Depo 157:14 - 158:2).  Such "bickering" is far from a materially adverse

action, nor does it amount to discriminatory intimidation, ridicule, or abusive conduct which was

sufficiently severe or pervasive to constitute a hostile work environment.  *See Hampton v.*

*Vilsack*, 760 F.Supp.2d 38, 55-56 (D.D.C.2011).

Looking at the evidence in the light most favorable to Plaintiff, she has failed to proffer

evidence of any materially adverse employment action or of any significantly adverse impact

during the 180-day limitations period.

As the 9th Circuit has stated:

> Title VII is not meant to protect against rules that merely inconvenience some
> employees, even if the inconvenience falls regularly on a protected class. Rather,
> Title VII protects against only those policies that have a significant impact.

*Garcia v. Spun Steak Co.*,  998 F.2d 1480, 1488 (9th Cir. 1993), Rehearing Denied,13 F.3d 296

(9th Cir. 1993), Cert. Denied 512 U.S. 1228 (1994).

No reasonable fact finder could find that Plaintiff has proffered evidence of any

materially adverse employment action or of any significantly disparate impact.  Therefore

Plaintiff has failed to establish a prima facie case of discrimination, and her claims of disparate

treatment and disparate impact due to the locker room policy, and of disparate treatment based on

"different administrative criteria" concerning time and attendance and dress code should be

dismissed.[1]

---

[1] Plaintiff cannot receive compensatory damages for a disparate impact claim and has no
right to jury trial for such a claim.  2 U.S.C. § 1311 (b)(1) (remedies under CAA for gender
discrimination are the same as those applicable under Title VII).  *See* 42 U.S.C § 1981a (no right

### Count 3 -- Disparate Treatment Gender Discrimination Due to Social and Professional Isolation

In Count 3, Plaintiff has alleged disparate treatment based on gender due to alleged "social and professional isolation within the Electric Shop."

### Social Isolation

Plaintiff testified that the social isolation claim involved her co-workers closing the breakroom off and not including her in food orders for pizza and such.  She testified that the instances were documented in the 221 page packet submitted in response to Defendant's request for documents.  (App 234, Swann Depo at 158:3-22).  Those documents reflect only the following three instances of alleged exclusion at lunch:

> "3-17-08,10:38 everyone is having pizza and no one asked me" (App 35,  Doc response at 40);

> "4-17-08,1130-1230 the guys shut the door to break area during lunch"   (App 34, Doc response at 24)

> "4-22-08,1145-1235 The guys shut the door to the break area during lunch I went in on computer" (App 34 & 36,  Doc Response 24, 45).

Plaintiff's interrogatory response lists three additional times when this allegedly happened or which she listed under social isolation but which are not reflected in the documents submitted to Defendant:

- February 8, 2008: male co-workers in break area during lunch share Lasagna made by female friend of Tony Marbury.  Plaintiff told by Mike Graham it was a private lunch. (App 8, SI-Prog p. 8)

- March 13, 2008, Marbury, Cox, Dimisi and Herrera leave break room when Plaintiff enters. (App 10, SI-Prog at 10)

---

to compensatory damages or jury trial for disparate impact claim).

- April 14, 2008 lunch–break room door shut and allegedly "locked" (App 12, SI-Prog p. 12).

Even if it were assumed that each of the alleged incidents occurred, Plaintiff has failed to present evidence upon which a reasonable jury could find a materially adverse employment action. *Peters v. District of Columbia*, 2012 WL 1255139, 26 (D.D.C. 2012):

> An "adverse employment action" is "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing significant change in benefits." . . . Thus, "not everything that makes an employee unhappy is an actionable adverse action." *Baird*, 662 F.3d. at 1250 (internal citation omitted).

Title VII, and by extension the CAA, is not a "civility" statute. No reasonable jury could find co-workers having lunch together which excluded Plaintiff, or otherwise shunning her, to be a significant change in employment status. *See Scheer v. Motorola, Inc.*, 2010 WL 1878265, 16 (E.D.Pa. 2010), finding in the context of retaliation claim that:

> "No reasonable jury could conclude that the evidence presented by Scheer showing that she was afraid to attend meetings and that she felt alienated by her coworkers establishes an adverse employment action;" and "Evidence that Scheer was shunned at work is, likewise, insufficient to convince a reasonable jury of an adverse employment action. Title VII is not a "general civility code." *Faragher*, 524 U.S. at 788. It does not require that Scheer's co-workers "take sides" by supporting Scheer, nor does it require that co-workers be, or remain, friends. *Brooks v. City of San Mateo*, 229 F.3d 917, 929 (9th Cir.2000) ("Because an employer cannot force employees to socialize with one another, ostracism suffered at the hands of coworkers cannot constitute an adverse employment action.") . . . . The conduct of Scheer's co-workers following her complaint does not constitute an adverse employment action."

*Scheer*, 2010 WL 1878265, 16; *Nichols v. Billington*, 402 F.Supp.2d 48, 68 (D.D.C. 2005):

> "The fact that plaintiff believes she was getting the cold shoulder from her co-workers does not constitute a materially adverse consequence or disadvantage in the terms and conditions or her employment so as to establish an adverse personnel action." *Roberts v. Segal Co.*, 125 F.Supp.2d 545, 549 (D.D.C.2000); *Raymond v. U.S. Capitol Police Bd.*, 157 F.Supp.2d 50, 59 (D.D.C.2001) (same);

> *Williams v. City of Kansas City*, 223 F.3d 749, 754 (8th Cir.2000) ("[Defendant's] silent treatment [of plaintiff] is at most ostracism, which does not rise to the level of an actionable adverse employment action."); *Strother v. S. Cal. Permanente Med. Group*, 79 F.3d 859, 869 (9th Cir.1996) ("[M]ere ostracism in the workplace is not enough to show an adverse employment action."); *Brooks v. San Mateo, 229 F.3d 917*, 929 (9th Cir.2000) (noting both that "badmouthing an employee outside the job reference context" does not constitute an adverse employment action, and that "holding an employer liable because employees refuse to associate with each other might well be unconstitutional"). Accordingly, Plaintiff cannot maintain a retaliation claim based on an assertion that Mr. Columbia somehow "pitted other employees against" her.

*Nichols v. Billington*,  402 F.Supp.2d 48, 68 (D.D.C. 2005).

Therefore, Plaintiff's claims of gender discrimination due to social isolation cannot be found by a reasonable jury to constitute adverse employment actions, and should be dismissed.

### Counts 4 – Professional Isolation and Disparate Treatment Gender Discrimination Due to Segregation of Plaintiff by Job Assignment from Male Employees

Plaintiff testified that the Electric Shop project involving installing the new allegedly environment friendly CFL light bulbs and working in the inventory room constituted her professional isolation claim as well as her claim of segregated job assignments.  (App  ,Swann Depo at 182:4-13).

### Inventory

Plaintiff's interrogatory response related that

During the time frame February 2008 -April 2008, Plaintiff's duties and assignments were restricted to the locale of the Electric Shop where she was required to sit across the walk way from the desk of former Supervisor Gatewood.

 (App 7, SI-Prog p. 7).  Plaintiff testified that the professional isolation discrimination occurred when "they didn't rotate me like they stated they were supposed to rotate.  Like, for one, for inventory, each electrical worker – per Robert Gatewood – was supposed to rotate working in the

inventory."   (App 234, Swann Depo at 158:24-160).   According to Plaintiff, the inventory room was directly across from the supervisor's office.  (App 235, Swann depo at 161:19-25).   There were three electrical workers who were supposed to rotate working in the inventory room, Plaintiff, Dave Gordan and Charles Wright.  (App 234, Swann Depo at 159:9-16).

The gravamen of Plaintiff's complaint of professional isolation is only her disagreement with her supervisor's decision as to when to assign her to work inventory and install CFL lights. (App 236-237, Swann Depo at 176:14-177:15).

Plaintiff has admitted that doing the inventory was part of the duties of the three electrical workers.  Thus, she is merely quibbling with her supervisor's decision as to how long to assign her that duty.  That decision is not an adverse employment action.  *See Baloch v. Kempthorne*, 550 F.3d 1191, 1197 (D.C. Cir. 2008) ("Indeed, we have previously underscored our hesitancy to engage in "judicial micromanagement of business practices" by second-guessing employers' decisions about "which of several qualified employees will work on a particular assignment." *Mungin v. Katten Muchin & Zavis*, 116 F.3d 1549, 1556 (D.C.Cir.1997)." ).

Additionally, Plaintiff's Supervisor, Mr. Gatewood, had a legitimate non-discriminatory reason for not rotating Plaintiff from the inventory room earlier; he believed that she had not followed his direction as to how the inventory was to be done.

> I had assigned Audrey to begin an inventory physical count in January. It was expected for her to perform a portion of this task during that month, then the other Electrical Workers (WG-2805-08s) would rotate in month by month. Audrey, not willing to do as I asked, went to Hammett and had him over turn my direction. It was decided between them to not perform a physical count, but to simply write-off most of the inventory. This raised a red flag with the AOC inventory managers, for this write-off was in excess of $350K for one month, where previously we had not exceeded $80K in our busiest month.

18

(App 344, DDR 238, Gatewood Memo 4/24/08; App 342-343 , Gatewood Dec. ¶ 6-8).   Mr.

Gatewood maintained Plaintiff in the inventory room to do the count as he had directed.   As a

result of requiring that the count be done as he directed, he was able to get two 100% accuracy

ratings during Inventory Cycle Count Audits.   (App 343, Gatewood Dec. ¶8).   Plaintiff admits that

Mr. Gatewood told her that this was the reason for his actions. (App 14, SI-Progs at 17) ( "March

13, 2008 at approximately 7:50am: Plaintiff had a conversation with former Supervisor Gatewood

in regards to the inventory.   He exclaimed that the inventory was not done correctly and that it

was Plaintiffs fault because she did not follow his instructions but followed those of former

General Foreman Hammett.").

At issue is not whether Mr. Gatewood's action in this regard was right, wrong or fair, but

whether Plaintiff has produced sufficient evidence for a reasonable jury to find that the employer's

asserted non-discriminatory reason was not the actual reason and that the employer intentionally

discriminated against Plaintiff on the basis of her gender.   *See Waterhouse v. District of*

*Columbia*, 298 F.3d 989 (D.C.Cir. 2002):

> . . . Waterhouse's responses offered no grounds for a rational juror to
> conclude that the reason she was fired was racial discrimination rather than poor
> performance. *See Forman v. Small*, 271 F.3d 285, 291 (D.C.Cir.2001) ("Consistent
> with the courts' reluctance to become involved in micromanagement of everyday
> employment decisions, the question before the court is limited to whether
> [plaintiff] produced sufficient evidence of ... discrimination, not whether he was
> treated fairly...." (citations omitted)); *Fischbach*, 86 F.3d at 1183 (noting that to
> rebut the employer's nondiscriminatory explanation " '[i]t is not enough for the
> plaintiff to show that a reason given for a job action is not just, or fair, or sensible'
> " (*quoting Pignato v. American Trans Air, Inc*., 14 F.3d 342, 349 (7th Cir.1994))).

*Id*. 298 F.3d at 995; *Smith v. Jackson*, 539 F.Supp.2d 116, 136 (D.D.C.2008)

> Significantly, the Court is without authority to " 'second guess an employer's
> personnel decision absent demonstrably discriminatory motive.' " *Fischbach*, 86

> F.3d at 1183 (*quoting Milton v. Weinberger*, 696 F.2d 94, 100 (D.C.Cir.1982)). As
> a result, "[o]nce the employer has articulated a non-discriminatory explanation for
> its action ... the issue is not 'the correctness or desirability of the reasons offered ...
> but whether the employer honestly believes in the reasons it offers.' " *Id.* (*quoting*
> *McCoy v. WGN Continental Broadcasting Co.*, 957 F.2d 368, 373 (7th Cir.1992)).

*Id*. 539 F.Supp.2d at 136.

Here, Mr. Gatewood believed that Plaintiff had circumvented him in the supervisory chain

to get out of having to do a physical count as he had directed.  This had caused a write-off in

excess of $350,000.  He wanted this corrected, and kept Plaintiff in the inventory room to do so.

Based on the evidence, no reasonable jury could find that the assignment to work in the inventory

room was an adverse employment action as to Plaintiff or was due to Plaintiff's gender.

**Light Bulbs**

Similarly, Plaintiff complains that although all three of the electrical workers were

required to install the new CFL light bulbs in the building(s) they were assigned to, she had to go

to other buildings to change bulbs.  She alleged that of the three, she was the person who stayed

on the CFL light bulb project the longest.  (App 236, Swann Depo at 177:4-16).   For the months

of April through August 2008 (i.e. within the 180-day limitation period), Plaintiff installed 21

CFL light bulbs in the Cannon, Ford and Rayburn Buildings; Gordon installed 20 CFL light bulbs

in the Cannon, Ford and 501 1st Street buildings; Wright installed 75 CFL bulbs at 501 1st Street.

(App 246 & 59-73, CFL chart and "Employee Task Detail by Building" work forms ).  Plaintiff's

task details reflect that of 501.75 hours worked, 98.5 were devoted to CFL bulb installation.  *Id*.

Thus, the evidence reflects that Plaintiff did not spend all of her time installing CFL light bulbs,

she did not install the majority of the CFL light bulbs, and Mr. Gordon also was assigned to install

CFL light bulbs at multiple buildings.  Based on the evidence, no reasonable jury could find that

the assignment of CFL light bulb installation among the three electrical workers was an adverse

employment action as to Plaintiff.

### Counts 5 & 7 – Hostile Work Environment

Plaintiff claims hostile work environment based on gender (Count 5) and based on

retaliation (Count 7).

Defendant's Interrogatory 11 asked Plaintiff to:

Provide the factual basis for your allegation that a hostile work environment was
created against you, including but not limited to a description of each act and
statement which you contend was involved in creating the hostile work
environment, the date and place of such act or statement, who did the act or
statement, who witnessed the act or statement.

(App 19, SI-Progs p. 87).

Plaintiff's response listed the following acts of others:

1.    January 2, 2008:  Plaintiff attempted to speak with Assistant Supervisor Gatewood when
she reported to work about work related matters and former Supervisor Gatewood ignored
the Plaintiff and walked away from her.  *Id.*

2.    January  8, 2008: Conversation among co-workers Mike Graham, Tony Marbury, Starold
Celestine and Supervisor Gatewood in which "Laughingly, someone made the statement
that "we all better hurry up and leave before we get in trouble for talking man talk cause
someone might just run to Dan Murphy, [Assistant Superintendent], and EEO/Cr instead
of resolving problems in the Shop." *Id.*

3.    February 8, 2008: During lunch time the guys were having group lunch. A female friend of
Tony Marbury had made them lasagna. He offered the lasagna to other co-workers. Tony
told Starold Celestine to shut the door to the break area. Supervisor Gatewood went in to
eat as well Plaintiff went in the break area to get her lunch from the refrigerator and Mike
Graham said. "Hey now Miss Audrey this is a private lunch didn't you see the door shut."
Plaintiff stated "Don't worry I'm leaving.  *Id.*

4.    February, 2008 and March, 2008: On a daily basis, during morning break, lunch and
evening break, the door to the shop break room would be shut.  (App 19).

5.    March 13,2008: Upon the entry of the Plaintiff into the break room, Tony Marbury, Sean

Cox, Joe Dimisi and Dennis Herrera all leave the room.  (App 22).

6.      March 17, 2008: Tony Marbury and Starold Celestine had gotten pizza for lunch. Starold offered lunch to the other co-workers. Mike Graham, Mike Long, David Gordon and former Supervisor Gatewood all had pizza. Pizza was offered to the Elevator operators Roger and Tina as well that day and they did eat. Again the door was shut. When Plaintiff went to her locker in the back, no one offered the Plaintiff.  *Id.*

7.      April 14, 2008: A Shop meeting was called by the Mike Graham on behalf of some of the male co-workers in the shop. 11 :00 -11 :30 In attendance was Deputy Superintendent Murphy, EAC member David Scrimminger, EEO/CP Representatives Theresa Bailey and Cesar Korzeniewicz, Day Supervisor Gatewood, Day Assistant Supervisor Sanders, Co-workers: Dennis Herrera, Joe Dimisi, Starold Celestine, Tony Marbury, Charles Wright, David Gordon, Mike Graham, Stanley Kaminski, Mike Long. Dennis Tice, Steven Wigglesworth, Sean Cox, Rick Hazzard and the Plaintiff.  The meeting was called to address the concerns that Plaintiffs male co-workers were uncomfortable working with the Plaintiff and felt they had to walk on egg shells around the Plaintiff as well as the information they were provided by management respecting Plaintiff's talking about them to the EEO/CP and management.  *Id.*

8.      April 14, 2008:   the Plaintiff spoke with Mike Graham a third time about watching his comments about the Plaintiff in the shop, whether or not he was joking.  Rick Hazzard commented about him moving a girl into his apartment. Mike Graham stated that "you know you like it when your girlfriend sits around the house with no shirt on with her tits hanging out don't you."  (App 23)

9.      The week before a similar comment was made in regards to Starold Celestine, Dave Gordon, Tony Marbury and Robert Gatewood while watching the Jerry Springer Show. Mike Graham called a lady on the show "a big fat lying Heifer" Plaintiff spoke to Mike and he joked and said well "Miss Audrey I can't control everything you gonna just have to leave the room. I'll try to work on it."  *Id.*

10.     April 14, 2008: during lunch, the break room door was shut again and locked.  *Id.*

11.     April 17, 2008: during lunch, the break room door was shut again and locked.  *Id.*

12.     April 18, 2008: Plaintiff  spoke directly to former Supervisor Gatewood and Assistant Supervisor Sanders about 7:45am about her being uncomfortable with her male co-workers since the April 14, 2008 meeting. Charles Wright and Dave Gordon.  Plaintiff was very upset and nervous. Plaintiff asked if there were any work she could perform by herself that day.  Former Supervisor Gatewood stated "unfortunately Audrey I don't.  Just try to deal with it." *Id.*

13.   April 22, 2008: Mike Graham statement while talking to Starold Celestine, Tony Marbury, and former Supervisor Gatewood: "You better hurry up and get out of here it is 8:50 you know what time it is." Gatewood commented was "yes, hurry up because someone will be down at the Ford building first thing tomorrow morning turning me in." They all looked at the Plaintiff, started to laugh and walked out of the shop.  (App 24).

14.   During the month of May, 2008, Plaintiff was working with Stanley Kaminski. Plaintiff and Kaminski were referred to as the "Ebony and Ivory team" by, Mike Graham, Tony Marbury and Starold Celestine on many occasions.  May 1, 2008 at about 3:40: Plaintiff asked Supervisor Gatewood to address said co-workers to stop referring to the Plaintiff and Kaminski as the Ebony and Ivory team. He stated "ok."  *Id.*

15.   May 2, 2008: Former Supervisor Gatewood had a shop meeting about signing in and out, getting dressed and work tickets. Mr. Gatewood spoke to Plaintiff and advised the Plaintiff to be finished in the locker room by 7:30 "no matter what." Plaintiff simply had to get there early enough to use the locker room or be in uniform when she arrived.  *Id.*

16.   May 8, 2008: Plaintiff was assigned to work with Stanley Kaminski at 0752 on this date. Stanley Kaminski advised the Plaintiff that he had met with former Supervisor Gatewood and two night Supervisors.  Gatewood directed Kaminski inter alia that he wanted him to keep an eye on Plaintiff and report everything she was doing.  (App 24-25).

17.   May 22, 2008: EEO/CP failed to give Plaintiff an investigative report re her first complaint.  (App 29).

18.   May 28, 2008: Former Supervisor Gatewood came in the shop to turn off the TV to have a shop meeting. Tony Anderson from the mid-night shift commented: "hey why did you turn that off we are about to be watching the sexy pictures on TV (news Hanna Montana photos). Supervisor Gatewood turned the TV back on and stated "he really didn't have much to talk about anyway."  *Id.*

19.   June  2, 2008: Plaintiff received an e-mail from Teresa Bailey stating that Superintendent Tiscione informed Director Bailey that Plaintiff had expressed continued concerns regarding Plaintiffs work environment to Superintendent Tiscione.  She further noted that" [i]f there is any new information or developments that have not been raised with EEO/CP, please advise us accordingly. Cesar Korzeniewicz and I would like to meet with you soon to discuss options in resolving your current claim. Please contact me or Cesar as soon as possible. . . .  *Id.*

20.   June 9, 2008: Stan brought lunch in an attempt to have the Plaintiff and former Supervisor Gatewood to work things out at lunch to which the Plaintiff said she would not have lunch with former Supervisor Gatewood that day "or any day ... " (App 31)..

23

21.   June 10, 2008: Plaintiff received a response from Teresa Bailey stating" Audrey, I am very concerned that there continue to be issues regarding your work environment. If you are experiencing on-going discrimination and retaliation, I need to know specific details so that these issues may be addressed accordingly. As I made clear during the April 14th Electric Shop meeting, employees should be allowed to contact EEO/CP without fear or retaliation. Supervisors at HOB have been made aware that retaliatory acts are prohibited by the Architect of the Capitol. Although I cannot guarantee that individual supervisors will heed all agency requirements, I can assure you that I will do what is necessary to prevent and rectify such behavior. I hope this response will encourage you to meet with us as soon as possible to discuss any new concerns that you may have and options regarding your current claim. A.C.'s Conciliation Program is a process available to employees who want to resolve employment disputes informally, but there are other options as well. We can discuss them more fully when we meet. I remain available to assist you in any way that I can. We are available to meet with you on Friday, June 13th at 10:00 am., or at any other mutually convenient time. Please advise." *Id.*

22.   June, 10, 2008: Former Supervisor Gatewood stated that Assistant Supervisor Sanders was going with the Plaintiff and that Plaintiff was being assigned to assist Dave Gordon to do the Cycle Counts for the Inventory because she knew how it was to be done. (Neither Assistant Sanders nor Dave Gordon had done this before). Plaintiff had been refused assistance when she was first required to conduct Inventory and Cycle counts . (App 31-32)..

23.   July 1, 2008: During the morning break Dennis Herrera passed the remote control to the TV in the break room of the Electric Shop area to Starold Celestine and dared him to turn the remote to a station that would bother the Plaintiff.  He told the Plaintiff to mind her own business. This statement was in regard to what shows were appropriate for them to be watching.  Plaintiff went to talk to former Supervisor Gatewood and explained that there had been two incidents with Dennis Herrera and the Plaintiff respecting the T.V.  Plaintiff requested former Supervisor Gatewood to speak to her male co-workers because  she believed some of them were taunting her and badgering her with respect to the shows they watched on the T.V.  Former Supervisor Gatewood said he would handle it.  (App 32-33).

To establish a hostile work environment claim, a plaintiff must show that her employer subjected her to "discriminatory intimidation, ridicule, and insult" that is "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Baloch v. Kempthorne*, 550 F.3d 1191, 1201 (D.C. Cir. 2008) (citations omitted).

Plaintiff listed 23 acts in a 7 month period which she contends form the hostile work

environment.   Seven of the acts (numbers 3-7, 10-11) appear to pertain to Plaintiff's claim of

retaliatory hostile work environment – i.e.  that she was socially isolated by her co-workers,

allegedly because she went to the EEO/CP.    Although Plaintiff admitted that she was

documenting  all negative acts towards her for her attorney, and that all such acts are documented

in her Response to Defendant's Document Request[2], Plaintiff's response only contains

documentation concerning three of the alleged events: numbers 6 (App 35 ,Doc Response 40), 7

(App 37, Doc Response 46), and  11 (App 34 , Doc Response 24).   Plaintiff presented no notes or

other concurrent documentation that in February and March the door to the shop breakroom was

closed on a daily basis during morning, lunch and evening break.   Nor do her notes reflect that

the door to the break room was locked.

As was discussed above, ostracism is not an adverse employment action, because an

employer cannot force employees to associate with each other.   Similarly ostracism is not

sufficient to establish a hostile work environment:

> Not every employment decision amounts to an adverse employment action.  For
> example, mere ostracism in the workplace is not enough to show an adverse
> employment decision. *See Fisher v. San Pedro Peninsula Hosp*., 214 Cal.App.3d
> 590, 615, 262 Cal.Rptr. 842, 856 (1989) (finding that the existence of a hostile
> work environment could make employer liable for retaliation, but noting that
> "[o]stracism ... does not amount to a hostile environment").

*Strother v. Southern California Permanente Medical Group*,  79 F.3d 859, 869 (9th Cir. 1996).

To establish a retaliatory hostile work environment claim, a plaintiff must show that her employer

---

[2]  *See* App 214-215,  Swann Depo 37:21-42:25.  Swann testified that she attempted daily
to document what happened throughout a day "to show a routine of the treatment that I was
receiving."  *Id*. 39:13 -24.   Plaintiff testified that all of her notes, with specifics of dates, co-
worker's name and what he said that she felt was improper are all in the documents that her
counsel turned over to Defendant. *Id*.  42:21-25.  She testified that she was documenting
everything important that happened.   *(*App 241, Swann Depo 193: 17-19).

subjected her to "discriminatory intimidation, ridicule, and insult" that is "sufficiently severe or

pervasive to alter the conditions of the victim's employment and create an abusive working

environment." *Baloch v. Kempthorne*, 550 F.3d 1191, 1201 (D.C. Cir. 2008) (citations omitted).

Looking at the evidence in the light most favorable to Plaintiff, and assuming for purposes of this

motion that even the undocumented incidents occurred, they do not constitute severe and

pervasive intimidation, ridicule or insult.   Nor is co-workers choosing not to socialize with

Plaintiff during break periods (i.e. on their personal time) harmful to the point that it "could well

dissuade a reasonable worker from making or supporting a charge of discrimination." *Burlington*

*Northern and Santa Fe Ry. Co. v. White,* 548 U.S. 53, 57 (2006).  As the Supreme Court stated:

> We speak of material adversity because we believe it is important to separate
> significant from trivial harms. Title VII, we have said, does not set forth "a general
> civility code for the American workplace." *Oncale v. Sundowner Offshore*
> *Services, Inc.,* 523 U.S. 75, 80, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998); *see*
> *Faragher*, 524 U.S., at 788, 118 S.Ct. 2275 (judicial standards for sexual
> harassment must "filter out complaints attacking 'the ordinary tribulations of the
> workplace, such as the sporadic use of abusive language, gender-related jokes, and
> occasional teasing' "). An employee's decision to report discriminatory behavior
> cannot immunize that employee from those petty slights or minor annoyances that
> often take place at work and that all employees experience. See 1 B. Lindemann &
> P. Grossman, Employment Discrimination Law 669 (3d ed.1996) (noting that
> **"courts have held that personality conflicts at work that generate antipathy"**
> **and " 'snubbing' by supervisors and co-workers" are not actionable under §**
> **704(a))**. The antiretaliation provision seeks to prevent employer interference with
> "unfettered access" to Title VII's remedial mechanisms. *Robinson*, 519 U.S., at
> 346, 117 S.Ct. 843. It does so by prohibiting employer actions that are likely "to
> deter victims of discrimination from complaining to the EEOC," the courts, and
> their employers. *Ibid*. **And normally petty slights, minor annoyances, and**
> **simple lack of good manners will not create such deterrence**. See 2 EEOC 1998
> Manual § 8, p. 8–13.

*Burlington Northern*,  548 U.S. at  68 (emphasis added);

> A supervisor's refusal to invite an employee to lunch is normally trivial, a
> nonactionable petty slight. But to retaliate by excluding an employee from a

26

weekly training lunch that contributes significantly to the employee's professional advancement might well deter a reasonable employee from complaining about discrimination.

*Burlington Northern*,  548 U.S. at 69.

Therefore Plaintiff has failed to proffer evidence upon which a reasonable juror could find a hostile work environment based on retaliation.

Plaintiff similarly has not proffered evidence upon which a reasonable jury could find severe and pervasive discriminatory intimidation, ridicule, and insult based on sex or gender.  As is reflected above, Plaintiff's interrogatory response only identifies three events which arguably relate to sex/gender harassment.  Number 8 -- Mike Graham statement to Rick Hazzard about his girl friend sitting around with her shirt open;   number 9 – Graham calling woman on Jerry Springer show a big fat lying heifer;   number 18 – Tony Anderson saying "why did you turn off [the tv] we are about to be watching the sexy pictures on tv (news Hanna Montana photos)." *See Tolson v. Springer*,  618 F.Supp.2d 14 (D.D.C. 2009):

> "Title VII is not a general civility code for the American workplace, nor does it serve as a remedy for all instances of verbal or physical harassment, for it does not purge the workplace of vulgarity." *Stewart v. Evans*, 275 F.3d 1126, 1133 (D.C.Cir .2002) (internal citations and quotation marks omitted). Ms. Tolson has failed to present a prima facie hostile environment claim because she has not pointed to race/gender-based conduct that was sufficiently pervasive and extreme as to constitute a change in the conditions of her employment.

*Tolson*, 618 F. Supp 2d at 22.   These isolated vulgar incidents do not support her claim.  Plaintiff similarly has failed to point to gender-based conduct that was sufficiently pervasive and extreme to constitute a hostile work environment.

## Count 6 – retaliation

After Plaintiff submitted her request for counseling to the Office of Compliance on August

27

6, 2008, the Office of Compliance recommended to her through her representative, Garland Strawderman, that she use the grievance procedures of the AOC for a period of 90 days.  (App 109,  August 20, 2008 referral ltr-DDR 97; *See also* § 2.03 (m) of the Procedural Rules of the Office of Compliance).  The procedure of the AOC requires its Conciliation Program, which is part of its Equal Employment Opportunity and Conciliation Programs (EEO/CP), to handle such referrals. (App 198-200, Conciliation Program Policy at p. 3-6).

On August 28, 2008, Plaintiff submitted to the EEO/CP the August 20 referral letter, a note from Swann naming him as her representative, a Building Inspector vacancy announcement, and a page entitled "Remedy" listing specific requested actions including promotion to a Building Inspector Position, waiver of all probationary periods for the position, reimbursement of 160 hours of leave, priority consideration for all future reassignments and promotions.[3]  (App  108-114).  On August 29 EEO/CP replied and requested that Plaintiff complete an EEO/CP form and "provide specific details, including the matter she seeks to remedy, the facts underlying her claim, along with relevant dates."  (App 115, DDR 119))

By memorandum dated October 10, 2008, Strawderman replied only generally that Plaintiff's claim was that "The agency has engaged in on-going discriminatory and retaliatory unlawful employment activities in direct violation of . . .[the CAA]."  (App 119-120, DDR 130-131 at ¶ numbered 1).  He stated that Plaintiff had given a detailed description of the alleged acts of discrimination to the Office of Compliance, (App 120, DDR131 at ¶ 2);  that the detailed

---

[3]  Plaintiff did not complain about non-selections in her August 2008 request for counseling that prompted the referral at issue here.  Plaintiff did not request counseling on non-selections until April 16, 2009.  (App 208-209, Certification and Notice of Invocation of Mediation).

description was confidential, and that EEO/CP's request for the information was in violation of

the CAA and Office of Compliance confidentiality policy.  (App 126-129; DDR 137-140).    He

asked for a meeting to request Plaintiff's "remedy."  (App 129).

By letter dated October 14, 2008, the EEO/CP Director agreed to meet with Plaintiff and

her representative, but advised "Please be aware that, unless Audrey signs the waiver form, I will

not be able to discuss or share her submission with management (App 130, DDR 141).  Plaintiff

responded with another letter again stating that the EEO/CP requests  "seem to be in conflict with

the statutory and regulatory scheme of the CAA."  (App 131, DDR 143).  By letter dated

November 7, 2008, Plaintiff submitted her version of an "Authorization Form"  which stated "I

hereby authorize EEO/CP to contact any representatives of the employing office (AOC), who has

actual authority to discuss my 'proffered remedy' and can provide a resolution of the matter(s)

about which counseling was requested."  (App 134-135, DDR 146-47).  This letter also failed to

advise EEO/CP what particular acts of discrimination Plaintiff might be alledging.  *Id.*

Plaintiff's list of requested remedies was submitted to the Superintendent of the House

Office Buildings, Frank Tiscione.  (App 136, DDR 152).  Unsurprisingly,  Mr. Tiscione replied

"Without specific details, I cannot agree to the remedy as proposed by Ms. Swann. I would gladly

participate in any mediation procedures with EEO or Office of Compliance but will do so only

when specific details are presented to allow us to move forward with the remediation process."

(App 137, DDR 91).  By letter dated November 14, 2008, Strawderman was advised of Tiscione's

response that "to participate in any conciliation/mediation efforts to resolve the matter, [] he

would first need specific details about the concerns underlying the remedies proposed."  (App

138, DDR 107-108).

29

EEO/CP received no response to its November 14 letter, and by letter dated December 12, 2008 EEO/CP advised that it would not take any further action concerning the referral.  (App 140 , DDR 84).

Plaintiff alleges that she was retaliated against by the EEO/CP and the Architect because, **after** she filed her request for counseling with the Office of Compliance, the matter was referred to the EEO/CP, and neither EEO/CP nor the Architect gave her a final letter or response concerning the outcome of the EEO/CP investigation.  (App 239-240, Swann Depo at 185-189). Because this allegedly happened after Plaintiff requested counseling on August 6, 2008, it could not have been included in the August 6 counseling request pursuant to which Plaintiff alleges she brought the instant complaint.

In Plaintiff's response to Defendant's letter to the Court pertaining to the proposed summary judgment motion, Plaintiff alleged that Plaintiff had returned to the Office of Compliance and "amended" the August 6 request for counseling to include the allegations in Count 6.  (ECF # 15 at p. 2).    But, the Office of Compliance certification of actions which occurred in Case No 08-AC-57 (CV,RP) does not reflect that any amendment to the Request for Counseling was made.  (App 207, Obiora Certification 12/16/2009).  Because making a timely request for Counseling is jurisdictional under the CAA, Plaintiff has the burden to show that she made a timely written request for counseling pertaining to the alleged act of retaliation.   (App App 190, PROC §2.03(c))  *See Schmidt v. U.S. Capitol Police Bd.*,  826 F.Supp.2d 59 (D.D.C. 2011):

> "the completion of counseling and mediation for one set of violations does not give the court jurisdiction over related claims of retaliation that occurred after counseling had commenced; the administrative remedies must be exhausted for

each claim." *Gordon v. Office of the Architect of the Capitol*, 750 F.Supp.2d 82, 92–93 (D.D.C.2010) (*citing Halcomb v. Office of the Senate Sergeant–At–Arms of the U.S. Senate*, 209 F.Supp.2d 175, 177–79 (D.D.C.2002)). Therefore, in order for this Court to have subject-matter jurisdiction over the plaintiff's claims, the plaintiff must have completed the requisite counseling and mediation, within the prescribed statutory periods, for each claim on which she seeks relief. *Schmidt*, 826 F.Supp.2d at 66 -67.

But even if Plaintiff could establish that she made a timely request for counseling concerning Count 6, Plaintiff has failed to proffer evidence upon which a reasonable jury could find any materially adverse act. Plaintiff did receive a final letter from the EEO/CP. She was told that because she had failed to respond to its requests for specific details about what she was complaining, EEO/CP would take no further action in the matter. (App 140, DDR 84). Indeed, because Plaintiff refused to enlighten EEO/CP of any facts underlying her claim of discrimination and retaliation, Defendant is at a loss as to how she had any expectation that they would "investigate" in a vacuum. EEO/CP does not engage psychics or mediums. No reasonable factfinder would find a materially adverse action in failure to investigate or submit a report when Plaintiff presented to the EEO/CP absolutely no factual predicate for her claims.

Additionally, even if Plaintiff could show some error on the part of the EEO/CP, the law of this Court and Circuit clearly holds that errors or mishandling of complaints by the employer is not actionable under Title VII. Title VII, and by extension the CAA, does not create a cause of action for mishandled complaints. *Nichols v. Truscott*, 424 F.Supp.2d 124, 134 (D.D.C. 2006) ("Title VII, however, 'does not create an independent cause of action for the mishandling of an employee's discrimination complaints.'" (citing *Young v. Sullivan*, 733 F.Supp. 131, 132 (D.D.C.1990), aff'd 946 F.2d 1568 (D.C.Cir.1991); *Ficken v. Rice*, No. Civ.A. 04-1132, 2006 WL 123931, *5, 2006 U.S. Dist. LEXIS 2689, at *15 (D.D.C. Jan. 17, 2006); *Robinson v. Chao*, 403

31

F.Supp.2d 24, 34 (D.D.C.2005)).   See also *Clariett v. Rice,* 2005 WL 3211694, *4

(D.D.C.2005).

    *Young v. Sullivan,* 733 F.Supp. 131 (D.D.C.1990) *affirmed* 946 F. 2d 1568 (D.C. Cir.

1991), *cert. denied* 112 S. Ct. 1291 (1992), for example, explains

> Title VII must be viewed as a comprehensive statutory scheme designed to
> eradicate employment discrimination. The only "right" it establishes is the right to
> be free of discrimination. This interest is wholly preserved, even if the EEOC errs
> in its processing of the charge, by the right to a trial *de novo . . . Hall v. Equal
> Employment Opportunity Com'n,* 456 F.Supp. 695, 700 (N.D.Cal.1978).

*Young,* 733 F.Supp at 132.   The CAA is the complementary statutory scheme for legislative

branch employees.  Plaintiff was clearly advised in the Office of Compliance Referral to Internal

Process that if the matter was not resolved internally, she could notify the Office of Compliance

that she wished to return to the procedures under the Office's rules within 10 days after the

expiration of the 90-day referral period. (App 109, DDR 97).  Plaintiff did return to the Office of

Compliance, and her complaint was processed under the CAA.  She now has exercised her right to

bring her civil complaint in this Court.  Thus, similar to Title VII, Plaintiff's allegation of

mishandling of her complaint during the referral period is not actionable under the CAA.

### COMPLAINT 2: 11-0419

**1    Counts 1-4, 10-16 : From Incident Report to February 5, 2010 Final Agency
Decision to Officially Reprimand – No Reasonable Fact Finder Could
Conclude that the actions Were "Materially Adverse"**

    Mr. Gatewood left the Electric Shop for a new position in September 2008.  (App 342,

Gatewood Dec ¶1-2).  Plaintiff's complaint number 11-0419, stems from matters that occurred in

late 2009, after Barry Moore had become her supervisor.  On October 28, 2009, Mr. Moore issued

32

Plaintiff an incident report for the infractions of disappearance during duty hours and failure to obey the reasonable orders of a Supervisor/Management official: Tom Carroll.  (App 75, 10-28-2009 Incident Report).  Attached to the Incident Report were memoranda to record from Moore and Carroll and previous incident reports.  Moore's memorandum stated that  "about 7:00 am on the 28th he told Plaintiff to work at the Firing Range with Sean and Denis (sic).  At 7:20 Denis came to the office and said he was going to run work orders, but that he needed to help Sean in the Firing Range."  Moore asked Denis if Audrey was there and Denis "only rolled his eyes."  At 7:35 Moore went to the firing range and found that Plaintiff was not there.  At 8:40 he learned that Plaintiff was in the nurse's office. (App 75,  Moore Memo).  Deputy Superintendent Carroll's memorandum reflected that Swann had gone to his office that morning.   (App 76, Carroll Memo).  She complained about being rotated back to the Rayburn building and being assigned to work with individuals with whom she had "problems."  Carroll told Plaintiff that she did not get to choose her work assignments or the people she was assigned to team with by her supervisor. Plaintiff became agitated and slammed out of his office.  He followed and instructed her to report with him to her supervisor Mr. Moore.  She refused to go with him to see Mr. Moore; Plaintiff stated that she was going to the nurse's station because she was too "stressed out" and was having an anxiety attack.  Carroll instructed her that she was required to notify her supervisor prior to leaving the work site, and that she was to be in her supervisor's office at 8:00 am for a meeting with him.  Carroll went to Moore's office, Plaintiff was not there and Moore did not know where she was.  (App77).

Based on the Incident Report, management requested that Plaintiff be issued an Official Reprimand.  (App 78, 11/17/09 memo).  By letter dated November 24, 2009, Plaintiff was given a

proposal to reprimand which was delivered on December 2, 2009.  (App 79-80, 11/24/09 ltr).

Plaintiff replied to the proposal to reprimand by memorandum to Superintendent William

Weidemeyer dated December 16, 2009.  (App 88).    On January 12, 2010, Plaintiff received

Weidermeyer's concurrence with the proposal to officially reprimand.  (App 89-90, 1/07/2010 ltr).

On January 13, 2010 Plaintiff requested a case review by a Hearing Officer.  (App 91, 1-13/2010

Request).    The Hearing Officer, an attorney with the firm of Danoff & Donnelly, issued a

memorandum that found the proposal to be "amply supported by the evidence," and recommended

the official reprimand of Plaintiff.    (App 95,1-22-10 Hearing Officer Memo).    The

memorandum notes, among other matters that

> in the documentation for the events of 10/28/09 it is not contradicted by Ms.
> Swann that she left her work assignment and then refused several instructions from
> managers Moore and Carrol on that date.  Consequently, relying on the lesser
> discipline of a formal reprimand [is] well within the recommended penalties.

(App 95).

By letter dated February 5, 2010, the Acting Architect of the Capitol notified Plaintiff of

his final decision to officially reprimand her.  (App 96, 2-5-10 Ayers ltr).

Plaintiff's claims of discrimination and retaliation pertaining to the incident report,

proposal to reprimand, concurrence to the proposal and the final agency decision to officially

reprimand should be dismissed because she has failed to present evidence of a materially adverse

action.  Reprimands generally are not considered material adverse actions.  *See Wade v. District of*

*Columbia*,  780 F.Supp.2d 1, 17 (D.D.C. 2011)

> Wade's seventh alleged adverse action is the reprimand issued to him for
> disobedience, which was later rescinded on appeal. As with a negative performance
> evaluation, however, a reprimand is generally not actionable as retaliation unless
> there is some evidence that it caused material harm to the employee. *See Baloch*,

> 550 F.3d at 1199. As this Court recently noted, "mere speculation that a letter of reprimand may lead to future punishment is insufficient to establish an adverse employment action." *Herbert v. Architect of the Capitol*, Civil Action No. 07–1516, 766 F.Supp.2d 59, 76, 2011 WL 637549, at *12 (D.D.C. Feb. 23, 2011) (citation omitted).

*Wade*, 780 F.Supp.2d at17. *See also Herbert v. Architect of Capitol*,  766 F.Supp.2d 59, 75 (D.D.C. 2011) ( letter of reprimand not materially adverse where it contained no abusive language, plaintiff  presented no evidence suggesting that his pay, grade, or working conditions were in any manner affected by the letter, or that it served as the basis for more severe disciplinary action).

Because such a letter of reprimand is not a materially adverse action, the intermediate decisions leading to it, which imposed no actual harm on Plaintiff, cannot be materially adverse actions.  *Cochise v. Salazar,*  601 F.Supp.2d 196, 201 (D.D.C. 2009)("Neither letters of counseling that contain job-related constructive criticism, . . . nor warnings without attendant effects on employment, . . . are materially adverse employment actions. *See Baloch*, 550 F.3d at 1199; *Halcomb v. Office of Sergeant-at-Arms*, 563 F.Supp.2d 228, 246-47 (D.D.C.2008)").  See also *Cochise*, 601 F.Supp.2d at 201 fn 3 (noting that intermediate decisions 'having no immediate effect upon employment decisions.' are not adverse employment actions).

In the instant case there is no evidence that the reprimand, or the intermediate steps leading to the reprimand, caused material harm to Swann or served as the basis for more severe disciplinary action.  On June 8, 2010,  a different supervisor, Mr. Adeyemi,  issued a proposal to suspend Swann for 5 days for failure to attend training.  The proposal listed among her prior misconduct the February 5, 2010 reprimand.  (App 104-105, 6-8-10 Proposal).  But, on July 13, 2010, the proposal was withdrawn by William Weidermeyer, HOB Superintendent, based on

documents submitted by Plaintiff.   (App 106, 7-13-10 Withdrawal Notice).

On March 30, 2012, Plaintiff was given a notice of decision to terminate her employment, based on an Inspector General investigation that found that she had falsified her application for employment.   (App 107,  3-30-12 Termination Notice).   Swann's termination for falsification of information during the employment process is excluded from the AOC progressive discipline policy.  (App 159, AOC Discipline Policy, Human Resources Manual, Chapter 752-3 at ¶.6 .2). Thus, the reprimand had no impact on the termination decision.

Plaintiff has submitted no evidence that the reprimand caused material harm.  Therefore there was no materially adverse action, and she has failed to establish a prima facie case of discrimination or retaliation pertaining to the reprimand.  Thus,  the Counts of the second complaint pertaining to the reprimand and the intermediate steps leading to it should be dismissed.

**2.      Counts 5-7, 14-16 – Handling of Grievance – No Reasonable Fact Finder Could Conclude that the Processing of Plaintiff's Grievance Was a "Materially Adverse" Action**

Plaintiff filed a grievance concerning her October 28, 2009 interaction with Mr. Carroll. On November 10, 2009,  Plaintiff submitted to William Weidermeyer, the Superintendent of the HOB a letter which began:

> I am writing in great distress to seek your immediate attention to a urgent matter. 1 am filing a formal grievance in accordance with the Grievance policy, 771-1 against the Deputy Superintendent Thomas Carroll for exhibiting treating, intimidating and hostile behavior towards me on October 28, 2009. This represents the latest incident in an ongoing pattern of retaliatory and discriminatory unlawful employment practices by members of the superintendent's office based on gender and my participation and opposition to unlawful employment practices.

(App 97, 11-10-09 Grievance ltr).

Mr. Weidermeyer responded by memorandum dated November 16, 2009, advising Swann

36

as follows:

> In accordance with the provisions of Human Resources Manual Chapter 771, Grievances, normally a grievance should be submitted through the informal grievance procedures to afford management the opportunity to resolve the matter. Nevertheless, because your grievance involves allegations against the Deputy Superintendent, I am forwarding the grievance to the Acting Deputy Chief Human Capital Officer for Operations (formerly the Director of Human Resources Management Division) for an investigation.
>
> In addition, because you raised allegations of "an ongoing pattern of retaliatory and discriminatory unlawful employment practices," I am referring those allegations to the Equal Employment Opportunity/Conciliation Programs (EEO/CP) Division for investigation.

(App 99, 11-16-09 Weidermeyer memorandum).  An investigation was conducted by the Employee Relations Branch.  The report of investigation found to be unsubstantiated by evidence Swann's allegations that Mr. Carroll's behavior on October 28, 2009 was threatening, intimidating, or hostile.  The report recommended that the grievance be denied.  (App 102, 01-14-10 Investigative Report).  On January 20, 2010, Teresa Bailey, the Chief Human Capital Officer sent Plaintiff a memorandum advising that she was denying the grievance.  (App 103, 01-20-10 Bailey Grievance Denial).  The memorandum also advised that Plaintiff could appeal the decision to the Acting Architect of the Capitol within 10 days.  Plaintiff failed to appeal.  (App 219-220, Swann Depo 72:15-74:18).

Plaintiff alleges that by sending her grievance to Ms. Bailey and to the EEO/CP Weidermeyer discriminated and retaliated against her, because according to Plaintiff he failed to follow the correct procedures.   (App 216-217, Swann Depo at 60:21-61:19).  She contends that Weidermeyer should not have sent the grievance to Bailey, but should have answered it himself.  (App 217, Swann Depo at 61:20-63:16).  Weidermeyer's action allegedly deprived Plaintiff of the

options of filing a formal grievance and then  appealing to the Architect of the Capitol.  (App 219, Swann Depo at 71:12-72:14).

No reasonable fact finder could find a materially adverse action or any inference of discrimination/retaliation from Weidermeyer's action.  First, the alleged violations of AOC procedure cannot raise an inference of discrimination/retaliation, because there was no violation of the AOC grievance procedures by Weidermeyer.  Plaintiff's letter on its face says that she is filing a "formal grievance."  (App 97, 11-10-09 Grievance ltr).   The AOC Grievance Procedures provide that formal grievances be decided by the Director of Human Resources (App 145,Order 771-1 at 3.2.4).  The Director is to assign the Grievance to her staff to conduct an investigation and prepare a report and recommendation.  *Id*. at 3.2.5.   The grievant may appeal the Director's decision to the Architect.  *Id*. at 3.2.6.   Because the Grievance procedures were followed, there can be no inference of discrimination due to failure to follow procedures.  Further, to the extent Plaintiff contends she had an entitlement under Order 771 to pursuing a formal grievance with HR and appealing to the Architect, Plaintiff was not denied any such entitlement.  Her formal grievance was sent to HR, investigated, a report was issued, and she received a decision from HR in which she was advised she could appeal to the Architect.  To the extent Swann, may contend that she intended only to pursue an informal grievance, she has submitted no evidence that after receiving Weidermeyer's memorandum advising that the grievance was being referred to HR, she objected that she only intended to pursue an informal grievance procedure.

Swann also did not object to EEO/CP doing an investigation.  (App 217-218, Swann Depo at 64:5-65:24).  At that time Swann was represented by her attorney, Mr. Leib, and an employee advisor, Mr. Strawderman.  (App 218, Swann Depo at 65).  To the extent that Plaintiff's letter

alleged that Carroll's actions were part of "an ongoing pattern of retaliatory and discriminatory unlawful employment practices," the matter properly was referred to the AOC Office of Equal Employment Opportunity and Conciliation Programs (EEO/CP).   The EEO/CP procedures provide that "The forum for pursuing CAA matters internally within the AOC is the AOC Conciliation Program.  CAA claims may not be raised under the AOC Grievance Policy (Chapter 771 of the AOC Personnel Manual)." (App199, EEO/CP procedures at p. 4).  The EEO/CP procedures also provide that AOC management may request assistance from EEO/CP concerning "recurring problems in one or more work units at the AOC." (App 201, *Id*. at  9).   In working to determine means to address and resolve the recurring problem EEO/CP may conduct a review and investigation, a conciliation, or other appropriate conflict resolution measures.  (App 201-203*, Id*. at 9-10, 12.   As Plaintiff admits, she was asked to meet with Ed Lopez, one of the EEO/CP counselors who attempted to conduct an investigation.  (App 217,Swann Depo at 63-64).  The investigation was closed on or about February 26, 2010.  (App 102, last page of rpt of investigation).

**3.      No Reasonable Fact Finder Could Conclude That the HR Director's Denial of Swann's Grievance Was  "Materially Adverse"**

On January 20, 2010, Teresa Bailey, the Chief Human Capital Officer, issued a grievance decision denying Plaintiff's grievance.  (App 103,1-20-2010 grievance decision).  The decision advised Swann of her right to appeal the decision to the Acting Architect of the Capitol within ten days, and explained that "The Acting Architect will issue a written final decision on your grievance."  *Id.*   Plaintiff failed to appeal the decision.   (App 216-217, Swann Depo at 60:21-61:19). Plaintiff has offered no evidence that the issuance of this appealable decision had any

materially adverse affect.   Further, although required to submit "the corrective action sought" in her grievance (App 152, AOC Personnel Manual 771-09 ¶3.2.3), Plaintiff's grievance letter failed to seek any corrective action.   Therefore, the denial of her grievance did not even deprive her of any requested corrective action.

**Counts 9 & 18 – Hostile Work Environment**

Plaintiff's second complaint alleges a gender (Count 9)  and a retaliatory (Count 18) hostile work environment.   Her complaint lists allegations pertaining to her reprimand and grievance during the period October 28, 2009 to January 25, 2010.   (Complaint II ¶ 4-80). Plaintiff's responses to Interrogatory 11 of Defendant's Interrogatories for Complaint II (S2-Progs), identify -- without specifying any dates --  additional actions allegedly forming the hostile work environment.   (App 58, S2-Progs p. 12).   The new allegations expand the hostile work environment time period to February/ March 2012.   These additional actions bear no relationship to Plaintiff's grievance and reprimand allegations.   Further, Plaintiff has not established that they occurred within the 180 day limitations period of November 14, 2009 to May 14, 2010.   As further described during Plaintiff's deposition, the additional allegations are:

1) In January 2009, an unknown person scanned in legal documents pertaining to Swann and emailed them to the Superintendent.  (App 221-222, Swann Depo 82:18-86:12)

2) In November 2010, Superintendant Dan Murphey refused to allow her to work overtime.   (App 223,  Swann Depo  89-90)

3) Conversation about condoms –   While watching "Family Feud" on TV, one of the men guessed that an answer was condoms, and condoms did appear on the TV as an answer. They joked about it.  Swann told Joe Toll (sic) (supervisor);  Plaintiff admits he said "okay guy's

which Swann admits possibly meant "okay, cut it out."  (App 224, Swann depo at 94) .  The next

day Plaintiff reports Celestine joke about condom stretcher.  She tells SupervisorAdeyemi who

took it to EEO; they investigated.  She is told the employees were disciplined. (App 224, Swann

depo at 96)

4) lock on locker broken by unidentified person – police report filed.  (App 224-225, Swann depo

at 96-100)

5) stealing her lunch – has happened 4 times (App 225-226,Swann depo100-102) reported it when

Gatewood there, when Moore there, when Sanders there.

6) anonymous complaint to IG re misrepresenting her credentials (App 226, Swann depo at 102)

7) computer stalking by office of IG (App 227, Swann depo at 105-106) (IG copied picture from

her face book page)

8) filling in leave slip for grace period (App 227-228, Swann depo at 107-109) (Swann testified

this has been going on for the last month)  [Her deposition was taken  taken in March 2012;

therefore it occurred in approximately February/March 2012].

## 4.     The Court lacks subject matter jurisdiction over part of Plaintiff's hostile work environment claim

According to Plaintiff,  the Request for Counseling pertaining to Complaint II was filed

with the Office of Compliance on May 14, 2010.  (Complaint II ¶ 5).  It is questionable that acts

which occurred outside the 180-day limitations period, November 14, 2009 to May 14, 2010,  can

be part of an actionable hostile work environment claim under the CAA.

Defendant is aware of two District Court opinions that have applied the continuing

violations doctrine of *Morgan v. Nat'l R.R. Passenger Corp.*, 232 F.3d 1008, 1015 (9th Cir.2000)

to statutes in which the exhaustion requirement is jurisdictional.  *Schmidt v. U.S. Capitol Police Bd.*,  826 F.Supp.2d 59, 67 -68 (D.D.C. 2011) (case brought under the CAA) and *Ragsdale v. Holder*,  668 F.Supp.2d 7, 18 (D.D.C. 2009)(rehabilitation Act case).  But *Morgan* only dealt with a hostile work environment claim brought under Title VII in which the exhaustion requirement is not jurisdictional.  *Morgan*,  536 U.S.  at 105 ("We consider whether, and under what circumstances, a Title VII plaintiff may file suit on events that fall outside this statutory time period.")  *Morgan*'s holding concerning a non-jurisdictional statute is not necessarily applicable to the CAA.  *Blackmon-Malloy*,  575 F.3d at 706 ("the unincorporated jurisdictional provision of Title VII does not guide our interpretation of the CAA."); *Gordon v. Office of the Architect of the Capitol*,  750 F.Supp.2d 82, 90 (D.D.C. 2010) ("defendant correctly points out, 'the CAA does not fully incorporate Title VII. [While t]he CAA incorporates much of Title VII's substantive law, ... it establishes its own comprehensive administrative regime—including jurisdictional provisions.'") (*citing  Blackmon–Malloy v. U.S. Capitol Police Bd.*, 575 F.3d 699, 706 (D.C.Cir.2009).

The *Schmidt*  and *Ragsdale* cases did not substantively address the implications of the jurisdictional nature of the CAA's exhaustion requirement to the application of *Morgan*'s hostile work environment continuing violations doctrine.   But, *West Virginia Highlands Conservancy v. Johnson*,  540 F.Supp.2d 125, 143 (D.D.C. 2008) dealt with the jurisdictional issue in the context of another statute:  "[T]his Court is compelled to hold that § 2401(a) is jurisdictional.  As a result of that conclusion, the entire basis for plaintiffs' argument that their complaint is timely-that the continuing violations doctrine tolled the limitations period-is not legally viable."

At least four other Judges in this District have stated that the federal discovery rule, as well as other judicially recognized exceptions, do not apply to a jurisdictional statute of

limitations. *See, e.g. Terry v. U.S. Small Business Admin.*, 699 F.Supp.2d 49, 54 -55 (D.D.C.

2010) (ESH):

> when a statute of limitations has been regarded as jurisdictional, 'it has acted as an
> absolute bar [that cannot] be overcome by the application of judicially recognized
> exceptions ... such as waiver, estoppel, equitable tolling, fraudulent concealment,
> the discovery rule, and **the continuing violations doctrine**.' " *Id.* (*quoting Felter*,
> 412 F.Supp.2d at 122 (citations omitted)). There is, therefore, no basis to suggest
> that the Court can ignore § 2401(a)'s jurisdictional bar .. . . Accordingly, plaintiff's
> claims are barred by the statute of limitations and must be dismissed under Rule
> 12(b)(1) for lack of subject matter jurisdiction.

*Terry*, 699 F.Supp.2d at 54 -55 (emphasis added) ; *Keohane v. U.S.*, 775 F.Supp.2d 87, 90

(D.D.C. 2011) (HHK)("'[W]hen a statute of limitations has been regarded as jurisdictional, it has

acted as an absolute bar that cannot be overcome by the application of judicially recognized

exceptions such as waiver, estoppel, equitable tolling, fraudulent concealment, the discovery

rule, **and the continuing violations doctrine**.'") ( *citing W. Va. Highlands Conservancy*, 540

F.Supp.2d at 138) (emphasis added); *Bigwood v. Defense Intelligence Agency*, 770 F.Supp.2d

315, 319 (D.D.C.2011) (RMU)( also citing *W. Va. Highlands Conservancy*); *Conservation*

*Force v. Salazar*, 2011 WL 3874816, 6 (D.D.C. 2011) (BJR)(same).   It appears that the D.C.

Circuit has not squarely decided the issue as it applies to the discovery rule.  *See Hardin v.*

*Jackson*,  625 F.3d 739, 743 (D.C. Cir. 2010) ("We conclude, as did the district court, that, **even**

**assuming the discovery rule applies here—an issue we do not decide** —the appellants' action

was filed out of time.") (emphasis added).

Defendant submits that the hostile work environment continuing violations doctrine, as

with other judicially recognized exceptions, does not apply to a jurisdictional limitations statute

such as the CAA.  The inapplicability of the continuing violation exception is suggested by the

*Blackmon* case.   *Blackmon-Malloy v. U.S. Capitol Police Bd.*, 575 F.3d 699, 706 (D.C. Cir. 2009) ("Because we hold that the CAA's counseling and mediation requirements are jurisdictional, the district court correctly ruled that it was not empowered to apply the equitable doctrine of vicarious exhaustion.").

Therefore, the Court does not have subject matter jurisdiction over any alleged hostile work environment that Plaintiff has failed to establish was exhausted under the CAA, i.e.  an alleged hostile work environment extending from May 14, 2010 to February/March 2012.

**Plaintiff failed to proffer sufficient evidence of a hostile work environment**

Even if *Morgan* is applicable to hostile environment claims under the CAA, the eight miscellaneous types of additional acts cited by Plaintiff that occurred outside the 180-day limitations period, many of which were done by different supervisors, an agent of the Inspector General (an independent part of the agency, see 2 U.S.C. § 1808) or by persons unknown, are not sufficiently like Plaintiff's claim of hostile work environment stemming from the disciplinary action and grievance to be part of one hostile work environment.  *Baird v. Gotbaum*,  662 F.3d 1246 (D.C. Cir, 2011):

> The *Morgan* principle is not, however, an open sesame to recovery for time-barred violations. Both incidents barred by the statute of limitations and ones not barred can qualify as "part of the same actionable hostile environment claim" only if they are adequately linked into a coherent hostile environment claim—if, for example, they "involve[ ] the same type of employment actions, occur[ ] relatively frequently, and [are] perpetrated by the same managers." *Morgan*, 536 U.S. at 120–21, 122 S.Ct. 2061. See also *id*. at 118, 122 S.Ct. 2061 (excluding any incident that "had no relation to the [other] acts ... or for some other reason, such as certain intervening action by the employer, was no longer part of the same hostile environment claim"); . . . .*Wheaton v. N. Oakland Med. Ctr.*, 130 Fed.Appx. 773, 787 (6th Cir.2005) ( Morgan requires inquiry into whether incidents "occurring outside the statutory period are sufficiently related to those incidents occurring within the statutory period as to form one continuous hostile work environment."

*Baird*, 662 F.3d at 1251.

Moreover, even if Plaintiff had exhausted the hostile work environment claims set forth in her interrogatory responses, she has failed to submit any evidence upon which a reasonable factfinder could find that she was subjected to a hostile work environment from October 2009 to February/March 2012 on the basis of gender or retaliation.  Plaintiff has failed to show that she was subjected to any discriminatory intimidation, ridicule, or abusive conduct which was severe or pervasive.  *Baird*, 662 F.3d at 1252 ("acts giving rise to a hostile work environment claim must collectively meet the independent requirements of that claim (i.e., be 'sufficiently severe or pervasive []' . . .") and must be adequately connected to each other (i.e., "all acts which constitute the claim are part of the same unlawful employment practice,"  . . . as opposed to being an array of unrelated discriminatory or retaliatory acts.").

Plaintiff's allegations of Mr. Carroll's allegedly aggressive behavior and yelling at her on October 28, 2009 (Complaint 2 ¶30-46) is not sufficiently severe to constitute a materially adverse act, much less a hostile work environment.  *See Baloch*, 550 F.3d at 1199 (four separate verbal altercations between an employee and a supervisor "did not meet the requisite level of regularity or severity to constitute material adversity for purposes of a retaliation claim.").

Therefore, the hostile work environment counts in the second complaint should be dismissed.                                        CONCLUSION

For the reasons set forth above, summary judgment should be granted to Defendant on all counts of Plaintiff's complaints.

Respectfully submitted,

RONALD C. MACHEN Jr., D.C. Bar #447889

45

United States Attorney

DANIEL F. VAN HORN
D.C. Bar # 924092
Civil Chief

By: _____/s/ Rhonda C. Fields_____

RHONDA C. FIELDS
Assistant United States Attorney
Civil Division
555 Fourth Street, N.W.
Washington, D.C.  20530
202/514/6970
Fax:   202/514/8780